## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL SCHNIEDERS, derivatively on behalf of PIXARBIO CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>FRANCIS M. REYNOLDS, KATRIN HOLZHAUS, DAVID A. CASS, and LAURA BARKER MORSE,<br><br>Defendants,<br><br>and<br><br>PIXARBIO CORPORATION,<br><br>Nominal Defendant. | Civil Action No. _____<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Schnieders ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant PixarBio Corporation ("PixarBio" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Francis M. Reynolds, Katrin Holzhaus, David A. Cass, and Laura Barker Morse (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of PixarBio, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a

1

review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PixarBio, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of PixarBio's directors and officers who breached their fiduciary duties starting from October 31, 2016 and continuing through the present (the "Relevant Period").

2.      PixarBio is a specialty pharmaceutical/biotechnology company that focuses on pre-clinical and commercial development of neurological drug delivery systems for post-operative pain. The Company was originally founded to develop treatments for Parkinson's disease and epilepsy, but later got involved in non-opiate painkillers. The Company invented NeuroRelease™, a morphine replacement, and non-opiate/opioid, non-addictive pain treatment.

3.      The original PixarBio Corporation was co-founded by Defendant Reynolds on August 29, 2013 in Nevada ("PixarBio Nevada"). Defendant Reynolds served as the CEO of PixarBio Nevada since then.

4.      On October 31, 2016, BMP Holdings, Inc. ("BMP") effected a short form merger with PixarBio Nevada, with BMP continuing as the surviving company. BMP then changed its name to PixarBio Corporation and became the current PixarBio. PixarBio Nevada was merged out of existence.

5.      On October 31, 2016, PixarBio began publicly trading its stock on the OTC Markets under the stock symbol "PXRB." On November 8, 2016, the Company began publicly trading its stock on the OTCQB Marketplace under the same stock symbol. On November 28, 2016, the Company began publicly trading its stock on the OTCQX Marketplace under the same stock symbol.

6.      Throughout the Relevant Period, the Company's press releases and Form S-1 filed with the SEC on November 25, 2016 (the "Registration Statement") touted the Company's development prospects and contained inaccurate and misleading statements about the Company's business, shareholders, employees, and development efforts.

7.      Additionally, on January 3, 2017, PixarBio announced its offer to takeover InVivo Therapeutics Corporation ("InVivo"), a publicly-traded biotechnology company co-founded and served by PixarBio's Chief Executive Officer ("CEO"), Defendant Francis M. Reynolds, who suddenly resigned from InVivo in 2013 and was subsequently sued by InVivo for breach of fiduciary duties.

8.      The same day, InVivo responded to PixarBio's purported takeover offer, stating that InVivo "was not privy" to the announcement made by PixarBio and "has not had any discussions with PixarBio Corporation nor any other party regarding this matter." InVivo described this offer as "not credible." InVivo also alleged that the PixarBio announcement "contained a number of unfounded statements."

9.      On January 23, 2017, PixarBio announced its withdrawal of its InVivo offer.

10.     The same day, SEC announced that it had temporarily halted trading of PixarBio stock "because the market for the security appears to reflect manipulative or deceptive activities."

The SEC also had "questions regarding the accuracy of assertions by PixarBio in press releases and its Form S-1 concerning, among other things: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts."

11.     From the open of trading on January 3, 2017 when a share of Company stock sold for $4.95 per share, the stock fell by close of trading on January 20, 2017 to $2.90 per share, before the SEC halted trading of PixarBio shares.

12.     As of today, PixarBio stock sells for $0.15 per share.

13.     In breach of their fiduciary duties owed to PixarBio, Individual Defendants caused the Company to engage in manipulative and deceptive activities with the intent to inflate the Company's stock price.  The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact concerning: (1) the company's business combinations and current shareholders; and (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts. The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein.  Importantly, three of the Individual Defendants (who are Company Directors) were set to offer millions of stock for sale while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact.

14.     Additionally, the Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and the Company's CEO to a securities fraud class action lawsuit pending in this Court (the "Securities Class Action"), have subjected the Company to the need to undertake internal investigations, and will cost the Company going forward many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, all of whom are current Directors of the Company, of the substantial likelihood of the CEO's liability in the Securities Class Action and all of the Individual Defendants' liability in this derivative action, of the Directors not being disinterested and/or independent, of one Director Defendants who sold over 64,500 shares of Company stock on material non-public information at artificially inflated prices, and of the three Director Defendants who were set to offer millions of shares of Company stock for sale on inside information, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or is an individual who is a citizen of New Jersey or who has minimum contacts with this District to justify the exercise of jurisdiction over them

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of PixarBio common stock. Plaintiff has continuously held PixarBio common stock at all relevant times.  Plaintiff is a citizen of Kansas.

### Nominal Defendant PixarBio

22.    Nominal Defendant PixarBio is a Delaware corporation with its principal executive offices at 200 Boston Avenue, Suite 1875, Medford, Massachusetts 02155.  The Company also maintains offices at 2200 Fletcher Ave., Suite 301, Fort Lee, NJ 07024.

23.    On October 31, 2016, the Company began publicly trading its stock on the OTC Markets under the ticker symbol "PXRB." On November 8, 2016, the Company began publicly trading its stock on the OTCQB Marketplace under the same ticker symbol. On November 28, 2016, the Company began publicly trading its stock on the OTCQX Marketplace under the same ticker symbol.

### Defendant Reynolds

24.    Defendant Francis M. Reynolds ("Reynolds") co-founded the original PixarBio Corporation in Nevada, PixarBio Nevada, in August 2013. Upon information and belief, he is a

citizen of Massachusetts. Defendant Reynolds has served as the CEO, Chief Financial Officer ("CFO"), Chief Scientific Officer ("CSO") and Chairman of the Board of PixarBio Nevada since then. From 2005 to August 2013, Defendant Reynolds was the founder, Chairman, CEO, CSO and CFO of InVivo. In August 2016, in connection with PixarBio Nevada's purchase of stock from BMP, which, as detailed below, merged with PixarBio Nevada on October 31, 2016 and became PixarBio, Defendant Reynolds was appointed as the Chairman, CEO, President, Principal Financial Officer and Principal Accounting Officer of BMP. The Company's Registration Statement simply introduces Defendant Reynolds as CEO, CFO, CSO and Chairman of the Board of Directors of PixarBio since August 2013, which was misleading and inaccurate. The Company noted in the Registration Statement that for purpose of the "Directors, Executive Officers, Promoters and Control Persons" section, "'PixarBio' shall include both the Company and PixarBio Nevada," and then went on to introduce the Company's "current directors and executive officers." According to the Company's Registration Statement, Defendant Reynolds also serves as a member of the General Nomination Committee.

25. The Executive Compensation section, however, begins stating, "[t]he following table sets forth information concerning the total compensation paid or accrued by us during the fiscal year ended December 31, 2015" without explaining who the word "us" referred to. Upon belief and information, the words "us" and "we" used in the Executive Compensation section of the Registration Statement both referred to PixarBio Nevada. According to the Registration Statement, Defendant Reynolds received $860,014 in compensation from PixarBio Nevada for the fiscal year of 2015, all in cash. Defendant Reynolds also entered into a two-year term employment agreement with PixarBio Nevada on January 25, 2016, pursuant to which Defendant Reynolds

would receive a base salary of $645,000 per year and annual bonuses of up to $400,000. The employment agreement also granted Defendant Reynolds options to purchase 413,200 shares of PixarBio Nevada's common stock at an exercise price of $.005 per share.

26.     According to the Registration Statement, as of October 31, 2016, Defendant Reynolds beneficially owned about 46,643,589 shares of the Company's common stock, which was approximately 59.2% of the Company's then outstanding common stock. As of November 21, 2016, Defendant Reynolds' stock holding increased to 47,905,567 shares.  Given that the price per share of the Company's common stock at the close of trading on November 21, 2016 was $10.00, Reynolds owned approximately $480 million worth of PixarBio stock.

27.     According to the Registration Statement, as part of the Company's public offering, Defendant Reynolds was set to offer 48,155,567 shares for sale at an inflated price.

28.     The Company's Registration Statement stated the following about Defendant Reynolds:

> **Francis M. Reynolds** has served as the Chief Executive Officer, Chief Financial Officer, Chief Scientific Officer and Chairman of the Board of Directors of PixarBio since August 2013. Mr. Reynolds co-founded PixarBio in 2013. From 2005 to August 2013, Mr. Reynolds served as the Chairman of the Board, Chief Executive Officer, Chief Scientific Officer, and Chief Financial Officer of InVivo Therapeutics Corp, a research and clinical-stage biomaterials and biotechnology company he founded in 2005. Due to a fractured foot which took 30 months to heal, Mr. Reynolds retired from InVivo Therapeutics in August 2013. In the spring of 2013, while leading clinical studies and regulatory affairs, Mr. Reynolds received the first FDA approval to begin human studies on his NeuroScaffold. In addition, he is a co-inventor on over 50 neurological biomaterials focused patent applications. His research has been published in the Journal of Biomaterials and the Journal of Neuroscience: Methods. As lead inventor on the NeuroScaffold, Mr. Reynolds led the team to become the first and only team to achieve functional recovery after a spinal cord injury in all three required models for FDA approval (rodents, non-human primates and humans). Mr. Reynolds was nominated for the "2013 Boston Business Journal CFO of the Year", and led InVivo Therapeutics to win the Boston Business Journal's "2013 Best Places to Work in Boston". He was featured in the March 2010 and October 2009 issues of Inc. Magazine. He was awarded the 2010 Irish Life Science 50 Award by the President

- 8 -

of Ireland, Mary McAleese. He was also awarded the 2016 Irish American Healthcare & Life Sciences 50 Award. Mr. Reynolds won the American Spinal Injury Association's "2011 David F Apple Award for Excellence in Publishing" in spinal cord injury rehabilitation research. Mr. Reynolds received the 2014 Irish Education 100 Award, and in March 2015 he received the 2015 IABCN "Taoiseach Award" or Prime Minister's Award for Leadership, presented by Anne Andersen, Ireland Ambassador to the USA. As the former Director of Global Business Development at Siemens, Mr. Reynolds was responsible for new business in over 100 countries. He has over 30 years of executive management experience and was the founder and CEO of Expand The Knowledge, Inc. He is an Executive Board Member of the Irish American Business Chamber and has served on the board of the Special Olympics of Massachusetts and Wharton Consulting Partners. Mr. Reynolds is also a member of the American College of Healthcare Executives, an international professional society of healthcare executives who lead hospitals, healthcare systems and other healthcare organizations as well as a member of the American Psychological Association. Mr. Reynolds suffered a paralyzing injury to his spine in December 1992. In the following months he began years of graduate school with formal training in Neuroscience, providing the foundation for his neuroscience expertise. He obtained an MBA from MIT-Sloan Fellows Program in Global Innovation and Leadership at Massachusetts Institute of Technology in 2006; a Master's of Science in Technology Management from The Wharton School in 2004; a Master's of Science in Engineering from University of Pennsylvania in 2003; a Master's of Science in Management Information Systems from Temple University in 2003; a Master's of Science in Health Administration from Saint Joseph's University in 1996; a Master's of Science in Counseling Psychology from Chestnut Hill College in 1993 and a Bachelor of Science in Marketing from Rider University in 1984. Mr. Reynolds has over 35 years of management experience, which we believe makes him well qualified to sit on our Board of Directors.

**Defendant Holzhaus**

29.     Defendant Katrin Holzhaus ("Holzhaus") co-founded PixarBio Nevada in August 2013 and has served as Chief Administration Officer and a director of PixarBio Nevada since September 2013. Upon information and belief, she is a citizen of Massachusetts.  According to the Registration Statement, Defendant Holzhaus had "worked in the executive suite" with Defendant Reynolds "for almost 15 years,"[1] initially with Expand the Knowledge, Inc., InVivo, then PixarBio

---

[1] Defendant Holzhaus's biography on the Company website stated that Defendant Holzhaus had worked in the executive suite with Defendant Reynolds "for over 15 years."

Nevada. She currently serves as a member of the Audit Committee.[2] As of October 31, 2016, Defendant Holzhaus beneficially owned about 2,325,627 shares of the Company's common stock, which was about 3% of the Company's then outstanding common stock. As of November 21, 2016, Defendant Holzhaus' stock holding increased to 2,497,794 shares.  Given that the price per share of the Company's common stock at the close of trading on November 21, 2016 was $10.00, Holzhaus owned approximately $25 million worth of PixarBio stock.

30.     According to the Registration Statement, Defendant Holzhaus received $239,577 in compensation from PixarBio Nevada for the fiscal year of 2015. This included $209,516 in salary, $21,700 in bonus, $500 in option awards, and $7,861 in all other compensation. Defendant Holzhaus also entered into a two-year term employment agreement with PixarBio Nevada on December 15, 2015, pursuant to which Defendant Holzhaus would receive a base salary of $245,000 per year and annual bonuses of up to 20% of the base salary. The employment agreement also granted Defendant Holzhaus options to purchase 103,300 shares of PixarBio Nevada's common stock at an exercise price of $.005 per share.

31.     According to the Registration Statement, as part of the Company's public offering, Defendant Holzhaus was set to offer 2,497,794 shares for sale at an inflated price.

32.     The Registration Statement stated the following about Defendant Holzhaus:

**Katrin Holzhaus** co-founded PixarBio as Chief Operating Officer and has served as Chief Administration Officer and a Director of PixarBio since September 2013. Having worked in the executive suite with PixarBio co-founder and CEO Frank Reynolds for almost 15 years she has had a front row view to revolutionary neurological R&D models that have led to breakthrough treatments for spinal cord injury and pain. Initially with Expand the Knowledge, InVivo Therapeutics Holdings Corp (NVIV), and now with PixarBio, Ms.

---

[2] According to the Company's Registration Statement, Defendant Holzhaus serves as a member of the Audit Committee. However, the Company indicated in the Corporate Governance page of its website that Defendant Holzhaus is a member of the General Nominating Committee.

Holzhaus brings complimentary leadership skillsets to PixarBio's operations team and a proven record of success. At PixarBio, Ms. Holzhaus oversees our administrative and resource allocation including long-range financial planning and budgeting, business and contractual services, research support, human resources, facilities planning and ensuring accountability across the organization by measuring results under established standard operating procedures, systems, and metrics. A critical partner to the CEO, her career has been focused on operational execution, organizational design, application of technology to the business and financial accountability. As a key member of the management team, she enables the organization's rapid growth and development based upon her strong track record of rapidly developing corporate capabilities. From July 2012 to August 2013, Ms. Holzhaus served as Senior Executive Assistant at InVivo Therapeutics a pharmaceutical company. From June 2004 to July 2012, she was Director of Operations at Magnum Group, Inc., a global communications company supporting clients in the life sciences sector. Ms. Holzhaus received her MBA and MS in Management Information Systems from Temple University, Philadelphia, Pennsylvania in 2002 and a Master of Arts from Leipzig University, Germany in 1993. Ms. Holzhaus has in excess of 20 years of experience in operations, corporate development, program management, entrepreneurship and communications, which we believe makes her well qualified to sit on our Board of Directors.

**Defendant Cass**

33.     Defendant David A. Cass ("Cass") served as a director of PixarBio Nevada since June 2014 and is now a director of PixarBio. Upon information and belief, he is a citizen of New York.  He is a member of both the Audit Committee and the General Nominating Committee. According to the Registration Statement, as of October 31, 2016, Defendant Cass beneficially owned about 185,021 shares of the Company's common stock. As of November 21, 2016, Defendant Cass beneficially owned about 120,459 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on November 21, 2016 was $10.00, Cass owned approximately $1.2 million worth of PixarBio stock.

34.     Between October 31, 2016 and November 21, 2016, Defendant Cass sold 64,562 shares of Company stock at artificially inflated prices on material non-public information.

35.     According to the Registration Statement, as part of the Company's public offering,

Defendant Cass was set to offer120,459 shares for sale at an inflated price.

36.     The Registration Statement stated the following about Defendant Cass:

**David A. Cass** has served as an independent member of the Board of Directors of PixarBio
since June 2014. Since September 2015, Mr. Cass has been the Chief Information Security
Officer for IBM. He has global responsibility for all aspects of security practices,
processes, and policies across the IBM Cloud & SaaS business unit. Mr. Cass also serves
as a banking compliance subject matter expert for IBM and leads the IBM cloud
compliance advisory body for financial services. Since January 2015, Mr. Cass has been
Key Contributor and Advisory Board Member of Securitycurrent, a security news and
information site by CISOs for CISOs. Since March 2014, he has been Member of Board of
Trustees of Lebanon Valley College. He has been Adjunct Faculty at Drexel University
since January 2009. From June 2011 to September 2015, Mr. Cass served as the Senior
Vice President and Chief Information Security Officer for Elsevier, leading an organization
of experienced legal, risk and security professionals that provided data protection, privacy,
security, and risk management guidance on a global basis for Elsevier. Mr. Cass previously
served as the Senior Director of Information Security Risk and Governance for Freddie
Mac and rebuilt the risk and governance function and as Vice President of Risk
Management for JPMorgan Chase where he was responsible for providing assessment of
risk management state, contributing to future direction of risk management, continuity &
disaster recovery. Mr. Cass obtained an MSE from the University of Pennsylvania's
Wharton School in 2006, and an MBA from MIT in 2012. He has extensive experience in
IT security, risk assessment, risk management, business continuity and disaster recovery,
developing security policies and procedures. He has played a key role in leading and
building corporate risk and governance and information security organizations in the
financial sector. Therefore, we believe he is well qualified to be on our Board of Directors.

**Defendant Morse**

37.     Defendant Laura Barker Morse ("Morse") had served as a director of PixarBio

Nevada since June 2016 and is now a director of PixarBio. Upon information and belief, she is a

citizen of Massachusetts.  She is a member of both the Audit Committee and the General

Nominating Committee. According to the Registration Statement, as of October 31, 2016,

Defendant Morse beneficially owned about 146,143 shares of the Company's common stock.

Given that the price per share of the Company's common stock at the close of trading on October 31, 2016 was $4.77, Morse owned approximately $697,102 worth of PixarBio stock.

38.    The Registration Statement stated the following about Defendant Morse:

**Laura Barker Morse** has served as an independent member of the Board of Directors of PixarBio since June 2016. She has been Director of reacHIRE, a venture-backed firm providing training and placement for professional women returning to the workforce, since May 2016. Since May 2008, Ms. Morse has served as Managing Director of Entrepreneurship Ventures Inc., a consulting and coaching firm focused on assisting global entrepreneurs to achieve their full potential. Between 1999 and 2008 she served as the Human Capital Partner for Atlas Venture, focused on portfolio company team building. She also headed human resources for the firm, coordinating with offices in Europe and in the U.S. to design and implement best in class recruitment, compensation, benefits and training programs. During 2010 she co-taught "Designing and Leading the Entrepreneurial Venture," an elective at MIT/Sloan School of Business. Ms. Morse obtained her BA in English and Psychology from the University of Iowa in 1968. She also led worldwide recruiting & expatriate services for S.W.I.F.T. sc Brussels, a global financial telecom consortium. She is a frequent speaker in Europe, Solvay (Belgium), Harvard Business School, and MIT/Sloan. Ms. Morse has extensive experience in consulting for global new ventures and specializes in human capital strategies including recruitment, development and reward systems, which we believe makes her well qualified to be on our Board of Directors.

## **Non-Party Bridges**

39.    Derek Bridges ("Bridges") served as a director of PixarBio Nevada since February 2015 and is now a director of PixarBio. He is a member of both the Audit Committee and the General Nominating Committee. According to the Registration Statement, as of October 31, 2016, Bridges beneficially owned about 49,498 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2016 was $4.77, Bridges owned approximately $236,105 worth of PixarBio stock.

40.    The Registration Statement stated the following about Bridges:

Derek Bridges has served as an independent member of the Board of Directors of PixarBio since February 2015. Since January 2013, Mr. Bridges has served as President and CEO of Next Level Alignment, Inc., providing advisory services to firms requiring management

consulting in the areas of healthcare, education, emerging technologies and their private equity and venture capital funding partners. The firm comprises a network of senior executives and experts in the U.S. Health Insurance markets, sales, virtual education, technology entrepreneurship and the alignment of growth strategies. He received an M.B.A. from the University of Kansas in 1999 and an M.S.E. in Technology Management from the University of Pennsylvania's Wharton School in 2005. Mr. Bridges has extensive experience with regulatory filing, bidding and reimbursement with the Centers for Medicare and Medicaid (CMS) and specifically with the Patient Protection and Affordable Care Act (PPACA). He previously served as a senior executive for several of the largest health insurance companies in the U.S. Mr. Bridges previously served as a senior executive for Anthem, Aetna and Delta Dental, developing growth strategies to double revenue/profitability in $100MM to $1B+ organizations. Therefore, we believe he is well qualified to be on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers, directors and/or fiduciaries of PixarBio and because of their ability to control the business and corporate affairs of PixarBio, the Individual Defendants owed PixarBio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage PixarBio in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of PixarBio and its shareholders so as to benefit all shareholders equally.

42.     Each director and officer of the Company owes to PixarBio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PixarBio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the officers and directors of PixarBio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PixarBio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware of or should have been aware of the potential risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company had been ratified by the remaining Individual Defendants who collectively comprised PixarBio's Board at all relevant times.

46.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded publicly on the OTC Markets, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, shareholders, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with

the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

47.     To discharge their duties, the officers and directors of PixarBio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of PixarBio were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how PixarBio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of PixarBio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that PixarBio's operations would comply with all laws and PixarBio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

48.      Each of the Individual Defendants further owed to PixarBio and the shareholders the duty of loyalty requiring that each favor PixarBio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.      At all times relevant hereto, the Individual Defendants were the agents of each other and of PixarBio and were at all times acting within the course and scope of such agency.

50.      Because of their advisory, executive, managerial, and directorial positions with PixarBio, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PixarBio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to issue the false and misleading statements as alleged herein and further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (ii) to artificially inflate the Company's stock price.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of PixarBio was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

- 18 -

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PixarBio, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

57.     The original PixarBio Corporation, PixarBio Nevada, was co-founded by Defendant Reynolds on August 29, 2013 in Nevada. Defendant Reynolds served as the CEO of PixarBio Nevada since then.

58.     In August 2016, PixarBio Nevada purchased 50,000,000 shares of the common stock of BMP. In connection with the purchase, Defendant Reynolds was appointed as Chairman of the Board, CEO, President, Principle Financial Officer and Principal Accounting Officer of BMP.

59.     On October 13, 2016, BMP formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary, under the laws of the State of Nevada. On October 31, 2016, PixarBio Acquisition was merged with and into PixarBio Nevada, with PixarBio Nevada continuing as the surviving corporation following the merger.

60.     Thereafter, on October 31, 2016, BMP Holdings effected a "parent/subsidiary short-form merger" with PixarBio Nevada, which BMP claimed to be its "wholly-owned

subsidiary." As a result of the merger, (i) BMP was the surviving entity and changed its name to PixarBio Corporation and (ii) the shareholders of PixarBio Nevada exchanged their shares of PixarBio Nevada for 78,529,976 shares of common stock of BMP, representing 97.9% of the issued and outstanding stock of BMP.

61.     BMP's name change was effective with FINRA on November 1, 2016.

**PixarBio Publicly Traded its Stock on the OTC Markets, the OTCQB Marketplace and the OTCQX Marketplace**

62.     On October 31, 2016, the Company's stock began publicly trading on the OTC Markets under the stock symbol "PXRB."

63.     On November 8, 2016, the Company's stock began trading on the OTCQB Marketplace for early state and developing U.S. and international companies under the same stock symbol.

64.     On November 25, 2016, the Company filed the Registration Statement with the SEC in order to register 78,529,976 shares of common stock that were issued and outstanding and 4,001,767 shares issuable to the selling stockholders if warrants were to be exercised.

65.     On November 28, 2016, the Company's stock began trading on the OTCQX Marketplace under the same stock symbol.

**The Company Announced Its Unsolicited Takeover Offer for InVivo Therapeutics Holdings Corporation**

66.     On January 3, 2017, PixarBio suddenly announced an offer to acquire InVivo for $77 million in stock.

67.     Defendant Reynolds founded InVivo and served as Chairman, CEO, and CFO of InVivo from 2005 until August 2013, when he abruptly resigned, citing unspecific health concerns. Immediately after the resignation, Defendant Reynolds founded PixarBio Nevada.

68.     In November 2013, three months after Defendant Reynolds' resignation, InVivo filed a lawsuit in Middlesex Superior Court in Massachusetts against Reynolds alleging breaches of fiduciary duties, breach of contract, conversion, misappropriation of corporate assets, unjust enrichment, corporate waste and seeking money damages and an accounting. The lawsuit involved approximately $500,000 worth of personal and/or exorbitant expenses that InVivo alleged Defendant Reynolds had inappropriately caused the Company to pay.

69.     In December 2013, Defendant Reynolds answered the complaint and filed counterclaims against InVivo. The counterclaims alleged two counts of breach of contract, two counts of breach of the covenant of good faith and fair-dealing, and tortious interference with a contract, and sought monetary damages and a declaratory judgment. The counterclaims involved Defendant Reynolds's allegations that the Company and the Board interfered with the performance of his duties under the terms of his employment agreement, and that Defendant Reynolds was entitled to additional shares upon the exercise of certain stock options.

70.     As of InVivo's most recent quarterly filings, this lawsuit was still pending.

71.     The 2013 law suit was not the only lawsuit between Defendant Reynolds and InVivo. InVivo's most recent quarterly filing also disclosed a lawsuit commenced by Defendant Reynolds on July 22, 2016 against InVivo and some of its directors and employees. The lawsuit alleged defamation, conspiracy and tortious interference, and sought monetary damages. The lawsuit was removed from New Hampshire state court to the United States District Court for the

District of New Hampshire in August 2016. The District Court of New Hampshire later dismissed the case with prejudice on November 30, 2016 for, *inter alia*, failing to state a claim.

72.    Given the hostile relationship between Defendant Reynolds and InVivo, the Company's takeover bid seemed a bit bizarre.

73.    The Company's January 3, 2017 press release, which was titled "It's Time to Make US Pharma GREAT Again, By Combining Two Frank Reynolds' Founded Pharmas, PixarBio Corp (OTCQX:PXRB) and InVivo Therapeutics (NASDAQ:NVIV)" (the "1/3/17 Press Release"), pointed to a 46 percent stock decline of InVivo in 2016 and disparaged InVivo's management since Defendant Reynolds resigned. The 1/3/17 Press Release compared InVivo's performance during 2005-2013, when Defendant Reynolds was the CEO, with its performance during August 2013-2017, after he left. According to the 1/3/17 Press Release, during 2005 to 2013, InVivo's share price "hit a high of $24.80/share (split-adjusted)," while within 60 days of Defendant Reynolds' resignation InVivo's stock "plummeted to near $4.00/share (split-adjusted)." Defendant Reynolds claimed part of the reason for the stock decline was his own claims to some of the company's patents for its neuro-spinal scaffold.

74.    The 1/3/17 Press Release stated that the deal "is expected to close in Q1 2017" and the new company would be named Reynolds Therapeutics Corporation.

75.    InVivo responded to the offer through a press release it issued the same day titled "InVivo Therapeutics Responds to PixarBio Announcement." In the press release, InVivo stated, in pertinent part:

> ***InVivo Therapeutics Corporation was not privy to the announcement made today and has not had any discussions with PixarBio Corporation nor any other party regarding this matter.*** Given that the nature of ***the offer is not credible***, InVivo disclaims any obligation to make any additional public statements regarding this or

similar proposed transactions from PixarBio.

(Emphasis added.)

76.    InVivo noted in the press release that "The PixarBio press release contained a number of unfounded statements that do not warrant a response." However, InVivo still provided a clarification regarding PixarBio's claims about patents and intellectual property. InVivo stated that it "has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the *Neuro-Spinal Scaffold*™" and that "Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested."

77.    On January 4, 2016, PixarBio issued a press release responding to InVivo's assertion that Reynolds has no intellectual property claims on the neuroscaffold technology (the "1/4/16 Press Release"). The 1/4/16 Press Release claimed that Defendant Reynolds "filed over 40 patents applications at InVivo Therapeutics, capturing the neuroscaffold in legal documents," and that InVivo "misled investors based on mincing trademarked words." Notably, the Company announced in the 1/4/16 Press Release that it would increase its offer for InVivo substantially, to $100 million, on the condition that certain directors and officers of InVivo must resign.

78.    On January 23, 2017, PixarBio issued a press release announcing that it withdrew its offer for InVivo "for reasons related to management credibility and competence, corporate governance and IP control" (the "1/23/17 Press Release").

79.    Following the announcement of the withdrawal, the SEC announced the same day that it had temporarily halted trading of PixarBio stock. The SEC's announcement stated, in pertinent part:

- 23 -

The Commission temporarily suspended trading in the securities of PixarBio because the market for the security appears to reflect manipulative or deceptive activities and because of questions regarding the accuracy of assertions by PixarBio in press releases and its Form S-1 concerning, among other things: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts. This order was entered pursuant to Section 12(k) of the Exchange Act.

80.     From January 3, 2017 through January 20, 2017, before the SEC halted trading of PixarBio shares, the Company's stock fell nearly 37%.

81.     On January 23, 2017, a reporter named Max Stendahl published an article in the Boston Business Journal titled "SEC halts trading in PixarBio amid concerns over stock manipulation," suggesting that the SEC's concern about "manipulative or deceptive activities," particularly its skepticism regarding the accuracy of the Company's assertions concerning "business combination," was "a possible reference to the InVivo offer."

### False and Misleading Statements During the Relevant Period

82.     On October 11, 2016, PixarBio issued a press release titled "PixarBio Corporation div. BMP Holdings Corp Announces a 10:1 Stock Split and Stock Symbol Change" (the "10/11/16 Press Release"), announcing that **BMP had executed a 10:1 stock split in preparation of closing its merger with PixarBio**. (Emphasis added.) The 10/11/16 Press Release stated, in pertinent part:

PixarBio Corporation, inventors of NeuroReleaseTM, a novel morphine replacement, non-opiate/opioid, non-addictive pain treatment, is pleased to announce BMP Holdings (PXRB:OTC) *a division of PixarBio Corporation* has executed a 10:1 stock split in preparation of closing its merger with its parent company PixarBio Corporation.

In recognition of public trading as PixarBio Corporation, BMP Holdings stock symbol has been changed to PXRB. *The 10:1 stock split will provide PixarBio with an important NASDAQ listing requirement. PixarBio expects to quickly up-list to the NASDAQ in Q4 2016.*

The merger with BMP Holdings will be finalized on October 21, 2016 and public trading of the new PixarBio Corporation will begin on Monday October 24, 2016.

(Emphasis added.)

83.     On October 30, 2016, PixarBio issued a press release titled "PixarBio Corporation, Finalized its Merger Transaction with BMP Holdings, Stock Trading on The OTC Markets Begins Monday October 31, 2016 Under New Stock Symbol PXRB" (the "10/30/16 Press Release"), announcing the finalization of the BMP merger and the start of PixarBio's public trading. The 10/30/16 Press Release stated, in pertinent part:

> PixarBio Corporation, inventor of NeuroReleaseTM, a morphine replacement, non-opiate/opioid, non-addictive pain treatment, is pleased to announce that **PixarBio Corporation has finalized its merger transaction with BMP Holdings, a division of the Company, effective Monday October 31, 2016 at 8:00AM EST.**
>
> Public trading of stock will begin at 9:30AM EST Monday, October 31, 2016 on the OTC Markets. PixarBio Corporation will submit a Super 8K early this week with details of the Merger.
>
> The company will file a S-1 registering all shares within 21 days of the merger or by November 21, 2016.
>
> **The company expects to submit an application to list on NASDAQ in the fourth quarter of 2016.**
>
> In summary:
>
> - Stock trading on Monday October 31, 2016 9:30AM EST under stock symbol PXRB
> - The surviving company BMP Holdings will change its name to PixarBio Corporation, effective with FINRA on Tuesday, November 1, 2016.
> - For just one day Monday October 31, the stock symbol PXRB will align with company name BMP Holdings. The name of BMP Holdings will change on the OTC Markets on Tuesday November 1, 2016 to PixarBio Corporation.
> - Potential investors will have the company name, PixarBio Corporation and the Stock Symbol PXRB fully updated on the OTC Markets on Tuesday November 1, 2016.

**The NeuroReleaseTM Platform: Non-Addictive and Non-opiate Treatment of**

**Pain**

NeuroReleaseTM is a morphine replacement, and non-addictive pain platform for the surgical/hospital setting, for the battlefield, or for acute and chronic pain. First product FDA approval for the platform will be for a 14-day post-surgical pain treatment and it is expected in late 2018.

Major Benefits of NeuroReleaseTM

- Effects only sensory signals
- No effect on locomotion nerve fibers, so patients can enter physical therapy quickly
- Maintains two-point discriminate touch so patients can function
- No effect on proprioception so no effect on a person feeling of well-being

Therefore, patients will maintain two-point discriminate touch, control of their locomotion nerve fibers so they control voluntary movement to enter rehabilitation quickly with a non-addictive morphine replacement. PixarBio's NeuroReleaseTM pain platform also includes 4-8 hour, 3-day, 7-day, 14-day and 90-Day pain treatments all have expected FDA approvals in 2020. NeuroReleaseTM is biodegradable, and it's non-toxic so NeuroReleaseTM can be re-injected to extend treatment timelines.

PixarBio Corporation was awarded the Boston Business Journal's "2016 Best Places to Work". The award recognizes PixarBio as one of the region's best firms, offering the greatest professional opportunities and work environments to innovate.

(Emphasis added.)

84.     On November 7, 2016, the Company issued a press release titled "PixarBio Corporation Says Goodbye To The Pink Sheets, with Approved Upgrade To The OTCQB Marketplace, Effective November 8, 2016 Under Stock Symbol PXRB" (the "11/7/16 Press Release"), stating that the Company had been "approved for upgrade to the OTCQB Venture Market after one week of trading" and that this upgrade was "a significant step forward for the Company in advance of [its] application to list on the Nasdaq Stock Market." The 11/7/16 Press Release stated, in pertinent part:

PixarBio Corporation, (OTCQB: PXRB) inventors of NeuroRelease™, a novel

morphine replacement, non-opiate/opioid, non-addictive pain treatment, today announced an upgrade to the OTCQB Marketplace for early stage and developing U.S. and international companies. OTCQB companies are current in their reporting and undergo an annual verification and management certification process. Investors can find Real-Time quotes and market information for the company on www.otcmarkets.com.

"We've completed one of the shortest stays on the pink sheets in history, as we're approved for upgrade to the OTCQB Venture Market after one week of trading and we'll continue to trade under stock symbol PXRB. We're delighted by investor response to support a non-addictive, morphine replacement to eradicate addiction from the Hospital setting and from acute and chronic pain treatment centers. OTCQB Market will enable our shareholders to hold and trade our common stock on an accredited exchange. *We view this as a significant step forward for the Company in advance of our application to list on the Nasdaq Stock Market.* It's been a great 10 year run, as a team and we're going to keep it going. We view this as yet another important accomplishment in building a world-class Pharmaceutical and Biotech company," PixarBio CEO Frank Reynolds concluded.

(Emphasis added.)

85.     On November 15, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"), which was signed by Defendant Reynolds. The Q3 2016 10-Q contained the following statement:

PixarBio Corporation

BMP Holdings Inc. ("BMP Holdings" of the "Company") was incorporated on August 4, 2014, under the laws of the State of Delaware. Our principal executive office is located in Medford, MA. Our fiscal year end is December 31. On January 1, 2015, we acquired our operating business in a transaction in which we exchanged 50,000,000 shares of common stock for the transfer of 100% of the ownership interest in Buddhi Mat LLC ("BM LLC") pursuant to a certain contribution agreement with Henry Sargent, our former officer and director. BM LLC is a Connecticut limited liability company that offers yoga and fitness classes to the general public. In December 2015, the Company agreed to issue Mr. Sargent an additional 2,450,000,000 shares of common stock in return for continued short term financing of Company operations. *On August 19, 2016, Mr. Sargent sold 50,000,000 shares of common stock held by Sargent to PixarBio Corporation, a privately held company ("PixarBio Nevada").* In connection with such sale, the 2,450,000,000 shares of common stock held by Sargent was retired to treasury. *On August 19, 2016, the Board appointed Frank Reynolds, the founder and Chief*

- 27 -

*Executive Officer of PixarBio Nevada, as Chairman of the Board, Chief Executive Officer, President, Principal Financial Officer and Principal Accounting Officer of BMP Holdings.* Mr. Sargent resigned from all officer positions he held at the Company in August 2016 and resigned as a director of the Company effective September 15, 2016.

*On October 13, 2016, BMP Holdings formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary, under the laws of the State of Nevada. On October 31, 2016, PixarBio Acquisition was merged with and into PixarBio Nevada, with PixarBio Nevada continuing as the surviving corporation following such merger.* On such date, *BMP Holdings effected a parent/subsidiary short-form merger with PixarBio Nevada, <u>our wholly-owned subsidiary</u>. On October 31, 2016, the merger pursuant to the Merger Agreement became effective. As a result of the merger, (i) BMP Holdings Inc. was the surviving entity and changed its name to PixarBio Corporation* and (ii) the shareholders of PixarBio Nevada exchanged their shares of PixarBio Nevada for 78,529,976 shares of common stock of BMP Holdings Inc., representing 97.9% of the issued and outstanding stock of the Company (see Note 6).

<u>Inherent Limitations of Internal Controls</u>

Our Principal Executive Officer does not expect that our disclosure controls or internal controls will prevent all error and all fraud. Although our disclosure controls and procedures were designed to provide reasonable assurance of achieving their objectives, a control system, no matter how well conceived and operated, can provide only reasonable, not absolute assurance that the objectives of the system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented if there exists in an individual a desire to do so. There can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

<u>Changes in Internal Control over Financial Reporting</u>

*There were no changes in our internal control over financial reporting, other than those stated above, during our most recent quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

(Emphasis added.)

86.     According to the Q3 2016 10-Q, BMP merged with PixarBio Nevada, the original PixarBio Corporation and a "wholly owned subsidiary" of BMP, with BMP continuing as the surviving company. The statements made by the Company in the Q3 2016 10-Q were contradictory to what the Company asserted earlier in its press releases. For example, the Company asserted in the 10/30/16 Press Release that PixarBio merged with BMP and that BMP was a division of PixarBio.

87.     Attached to the Q3 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Reynolds attesting to the accuracy of the Q3 2016 10-Q.

88.     The Company's SOX certifications contain the following attestations:

I, Francis M. Reynolds, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of PixarBio Corporation (f.k.a. BMP Holdings Inc.);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that

material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly during
the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal
control over financial reporting to be designed under my supervision, to provide
reasonable assurance regarding the reliability of financial reporting and the
preparation of financial statements for external purposes in accordance with U. S.
generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in this report our conclusions about the effectiveness of
the disclosure controls and procedures, as of the end of the period covered by this
report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over
financial reporting that occurred during the registrant's most recent fiscal quarter
(the registrant's fourth fiscal quarter in the case of an annual report) that has
materially affected, or is reasonably likely to materially affect, the registrant's
internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our
most recent evaluation of internal control over financial reporting, to the
registrant's auditors and the audit committee of the registrant's board of directors
(or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation
of internal control over financial reporting which are reasonably likely to adversely
affect the registrant's ability to record, process, summarize and report financial
information; and

(b) Any fraud, whether or not material, that involves management or other
employees who have a significant role in the registrant's internal control over
financial reporting.

89.    On November 23, 2016, the Company filed a current report on Form 8-K with the

SEC announcing that it had dismissed Scrudato & Company CPAs ("Scrudato") as its independent

registered public accounting firm (the "11/23/16 8-K"). The Company noted that the report for the

fiscal year ended December 31, 2015 contained the following statement regarding the Company's

ability to continue as a going concern:

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 4, the Company has limited operating history and has incurred losses since inception and has a working capital deficit. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also discussed in Note 84. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

90.     The Company claimed in the 11/23/16 8-K, in pertinent part:

During the fiscal years ended December 31, 2015 and 2014 and the subsequent interim period through November 18, 2016, there have been no "disagreements" (as defined in Item 304(a)(1)(iv) of Regulation S-K and related instructions) with Scrudato on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Scrudato, would have caused Scrudato to make reference thereto in their reports on the consolidate financial statements for such fiscal year. During the fiscal years ended December 31, 2015 and 2014 and any subsequent interim period through November 18, 2016, there have been no "reportable events" (as defined in Item 304)(a)(1)(v) of Regulation S-K).

91.     Two days later, on November 25, 2016, the Company filed the Registration Statement for 78,529,976 shares of common stock that were issued and outstanding and 4,001,767 shares issuable to the selling stockholders if warrants were to be exercised, which was signed by Defendant Reynolds. The Registration Statement contained the following statements:

*As used in this prospectus, references to the "Company," "we," "our" or "us" refer to PixarBio Corporation, unless the context otherwise indicates.*

We were originally incorporated as BMP Holdings Inc. in the State of Delaware on August 4, 2014. We were originally formed to provide yoga classes, private instruction, specialty workshops, clinics and yoga teacher training to the general public through our subsidiary, BM, LLC, at its facility in Ridgefield, Connecticut.

Frank Reynolds, Katrin Holzhaus, and Dr. Robert S. Langer co-founded PixarBio Nevada in August 2013 to develop novel drug delivery systems for neurological diseases.

On October 13, 2016, BMP Holdings formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary, under the laws of the State of Nevada. *On October 31, 2016, pursuant to a merger agreement, PixarBio*

*Acquisition was merged with and into PixarBio Nevada. As a result of such merger, PixarBio Nevada was the surviving corporation and a wholly-owned subsidiary of BMP Holdings.* On the same date, *BMP Holdings effected a parent/subsidiary short-form merger with PixarBio Nevada, our wholly-owned subsidiary. As a result of the second merger, (i) BMP Holdings was the surviving entity and PixarBio Nevada merged out of existence*, (ii) BMP Holdings changed its name to PixarBio Corporation and (iii) the shareholders of PixarBio Nevada exchanged their shares of PixarBio Nevada for 78,529,976 shares of common stock of BMP Holdings, representing 97.9% of our issued and outstanding stock.

…

Our Growth Strategy

We intend to file an Investigational New Drug ("IND") and initiate clinical studies in 2017 for nerve block pain treatments for total knee arthroplasty (large nerve) and shoulder surgery (small nerve). Further, we intend to file a New Drug Application (NDA) in 2018. Over the next five years, we expect to create a new clinical franchise in medicine around our microparticle and nanoparticle based pain portfolio pipeline extending into dental, trauma, and neuropathic pain. There can be no assurance these objectives can be achieved, see "Risk Factors".

…

Below is the "Forecasted US FDA 505(b)(2) Regulatory Path For NeuroRelease Pain", for which we plan first approvals occurring in 2018. However, the timelines are subject to uncertainties as to the pace and success of the clinical studies and the review of the US FDA, and there is no assurance that such approvals will be received.

2017   Build out cGMP Facility, Submit & Receive IND approval, initiate clinical studies
2018   Submit NDA to US FDA for 14-Day product, estimated US FDA approval for NeuroRelease 14-Day product
2019   Submit IND for NeuroRelease 3-Day "sprinkle on" product; submit IND for NeuroRelease 90-Day product
2020   Submit NDA to US FDA for NeuroRelease 3-Day "sprinkle on" product and NeuroRelease 90-Day product; estimated US FDA approval for NeuroRelease 3-Day "sprinkle on" product and NeuroRelease 90-Day product

…

Principles of Consolidation

The accompanying unaudited condensed financial statements as of September 30, 2016, *include the accounts of PixarBio Nevada and its then majority-owned subsidiary, BMP Holdings, Inc. From August 19, 2016 through September 30, 2016, PixarBio Nevada owned approximately 97% of the outstanding common stock of BMP Holdings, Inc.* For the period ended September 30, 2016, the noncontrolling interest in the income (loss) of BMP Holdings, Inc. was immaterial.

- 32 -

CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
ACCOUNTING AND FINANCIAL DISCLOSURE

On November 18, 2016, the Board of Directors approved a change in our
independent registered public accounting firm to Wolf & Company, P.C. ***There
have not been any disagreements with our current and prior accountants on
accounting and financial disclosure or any other matter.***
…
***For purposes of the balance of this section "PixarBio" shall include both the
Company and PixarBio Nevada.***
…
EXECUTIVE COMPENSATION

***The following table sets forth information concerning the total compensation
paid or accrued by* us *during the fiscal year ended December 31, 2015* to (i) all
individuals that served as our principal executive officer or acted in a similar
capacity for us at any time during the fiscal year ended December 31, 2015; (ii) all
individuals that served as our principal financial officer or acted in a similar
capacity for us at any time during the fiscal year ended December 31, 2015; and
(iii) all individuals that served as executive officers of ours at any time during the
fiscal year ended December 31, 2015 that received annual compensation during the
fiscal year ended December 31, 2015 in excess of $100,000.

(Emphasis added.)

92.     The Registration Statement also incorporated the Unaudited Interim Condensed

Consolidated Financial Statements of PixarBio Nevada and the statements' notes (the "Notes to

Condensed Consolidated Financial Statements"). PixarBio Nevada defined itself as "the

Company" in the Notes to Condensed Consolidated Financial Statements and stated in Note 1 that:

On October 13, 2016, BMP Holdings Inc. ("BMP") formed PixarBio Acquisition
Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary, under the laws of the
State of Nevada. On October 31, 2016, PixarBio Acquisition was merged with and
into the Company, with the Company continuing as the surviving corporation
following such merger. ***On such date, BMP Holdings Inc. effected a
parent/subsidiary short-form merger with the Company, <u>our wholly-owned
subsidiary.</u>*** On October 31, 2016, the merger pursuant to the Merger Agreement
became effective. As a result of the merger, (i) BMP Holdings Inc. was the
surviving entity and changed its name to PixarBio Corporation and (ii) the
shareholders of the Company exchanged their shares for 78,529,976 shares of

- 33 -

common stock of BMP Holdings Inc., representing 97.9% of the issued and outstanding stock of the Company.

93.     Note 11 of the Notes to Condensed Consolidated Financial Statements contained

similar but different statements. PixarBio Nevada stated in Note 11, in relevant part:

> On October 13, 2016, BMP Holdings Inc. formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary, under the laws of the State of Nevada. On October 21, 2016, PixarBio Acquisition was merged with and into the Company, with the Company continuing as the surviving corporation following such merger. ***Effective October 21, 2016, BMP Holdings Inc. effected a parent/subsidiary short-form merger with the Company, <u>its wholly-owned subsidiary.</u>*** As a result of the merger, (i) BMP Holdings Inc. was the surviving entity and changed its name to PixarBio Corporation and (ii) the shareholders of the Company exchanged their shares of the Company for 78,529,976 shares of Common Stock of BMP Holdings Inc., representing 97.9% of the issued and outstanding stock of the Company.

94.     The statements made by the Company in the Registration Statements, including the

statements in the Notes to Condensed Consolidated Financial Statements that were incorporated

into the Registration Statement, were inaccurate, misleading and contradictory for many reasons.

First, in certain parts of the Registration Statement, the Company stated that PixarBio Nevada was

the wholly-owned subsidiary of BMP, while in other parts, the Company stated that BMP was the

subsidiary of PixarBio Nevada. Second, the "Directors, Executive Officers, Promoters and Control

Persons" section of the Registration Statement contained inaccurate statements of each Individual

Defendant's background. For example, by simply stating "[f]or purposes of the balance of this

section 'PixarBio' shall include both the Company and PixarBio Nevada," the Company

introduced Defendant Reynolds as CEO, CFO, CSO and Chairman of the Board of Directors of

PixarBio since August 2013, which was inaccurate. Third, the Executive Compensation section of

the Registration Statement began with the statement that "[t]he following table sets forth

information concerning the total compensation paid or accrued by us during the fiscal year ended

December 31, 2015" without indicating that the word "us" actually referred to PixarBio Nevada, not PixarBio.

95.     On November 28, 2016, the Company issued a press release titled "PixarBio Corporation Upgraded To OTCQX Marketplace Effective on Monday November 28, 2016, Public Stock Trading Remains Under Stock Symbol PXRB" (the "11/28/16 Press Release"), announcing an upgrade to stock trading on the OTCQX Marketplace. The Company advised investors that ***"[t]o qualify to trade on the OTCQX market, companies must meet high financial standards, follow best practice corporate governance, demonstrate compliance with U.S. securities laws, be current in their disclosure, and be sponsored by a professional third-party advisor."*** (Emphasis added.)

96.     Additionally, the Company noted in the 11/28/16 Press Release that "PixarBio Shareholders will benefit from OTCQX trading by enabling institutional investors, retail investors, 401-K Plans, and any FINRA regulated broker-dealers of the investor's choice, making the PXRB investor trading experience nearly identical to that of trading NYSE or NASDAQ securities."

97.     On January 3, 2017, the Company issued the 1/3/17 Press Release, announcing an offer to acquire InVivo for $77 million in stock. The 1/3/17 Press Release stated the following, in pertinent part:

> **The $77,000,000 Stock Offer Will Create a New Pharma Called Reynolds Therapeutics Corporation to Solve the Opiate Crisis and To Regenerate Chronic Spinal Cord In Humans and Finally Cure Paralysis**
>
> PixarBio Corporation, (OTCQX:PXRB) today announced a take-over bid to acquire InVivo Therapeutics the company PixarBio CEO Frank Reynolds founded in 2005. The deal is expected to close in Q1 2017.
>
> PixarBio Board of Directors has approved the offer, Board member Derek Bridges explained "As a Board, we're focused on responding to the opiate/opioid crisis with

the development of NeuroRelease, and to solving Neurosciences biggest challenges in spinal cord injury, epilepsy, and Parkinson's disease. Our top priority is to replace Morphine, Percocet, Vicodin and other addictive opiates in the healthcare system. The threshold for US FDA approval for non-opiate post-surgical pain treatments is set low by Exparel, and will be easy to replace once NeuroRelease is FDA approved, which we expect in early 2019. In regards to neuro-trauma, we see great synergies for PXRB and NVIV shareholders combining both NVIV and PXRB patent portfolios. We'll rename PixarBio Corporation, Reynolds Therapeutics Corporation. Reynolds Therapeutics' R&D pipeline will be focused on developing breakthrough neurological treatments that will reduce costs all around the healthcare system. Reynolds Therapeutics will be a new type of Life Science Pharma focused on acute/chronic pain, acute/chronic spinal cord injury, adaptive technologies, epilepsy, and Parkinson's disease. Our portfolio will be FDA classified as either new drugs, new biologics, new devices and/or combo drug/device/biologics so the future is exciting for patients and we'll create a rare opportunity for investors interested in the future of non-addictive pain treatments and other challenging neurological conditions."

**PXRB Value Proposition for NVIV Shareholder: Clear and Obvious**

- No more down rounds by NVIV CEO Mark Perrin
- **NVIV closed on 12/31/2016 at $4.20/share**
- NVIV began 2016 at $7.20/share
- **NVIV down ~46% in 2016, a continued spiral downward! PXRB can Stop it**
- NVIV stock is back near its 2010 IPO share price of $4.00/share (split-adjusted)
- NVIV has hit its 2010 IPO price of $4.00/share, TWICE since Frank Reynolds resigned, once in 2013 and here we are again near $4.00/share in 2017
- It's time for a change at NVIV, **Stop The NVIV downward spiral**
- **Valuable sustainable stock in a combined PXRB/NVIV called Reynolds Therapeutics Corporation**

**On October 30, 2016 PixarBio (PXRB) closed a private offering at $2.00/sh. and closed on 12/31/2016 at $4.59/sh. up 129% in 2016 with a market cap over $415,000,000**

As one of Frank Reynolds' fellow Wharton Alumni, President-Elect Donald J. Trump might say

**"It's time to Make US Pharma GREAT AGAIN!!"**

"It's been over 3.5 years since I resigned as CEO of InVivo Therapeutics Corporation, to found PixarBio Corporation (PXRB) in August 2013. It's clear that 2013-2017 have not been great years for the NVIV CEO & the NVIV Board of Directors. The round of recent MAJOR exits makes it a perfect time to keep the required exits for success going. It's time to focus on shareholder value, and REAL change at NVIV. I founded InVivo Therapeutics over 11 years ago but the last 3.5 years have been a black hole for investor's money, and the NVIV team has had a real dead spot in innovation failing in the area of shareholder value creation, so it's time for real Change", said PixarBio CEO Frank Reynolds.

**NVIV Recent Exits in Q4 2016: Read the "Tea Leaves" of Change, Hopefully Not Finished…**

We've watched the NVIV legal team 2011-2016, Greenberg Traurig, replaced with Wilmer Hale…DONE
Since 2013, we've observed two NVIV CFOs replaced…we should know their exit deals…DONE
We've observed John McCarthy the Chairman of the Board of NVIV replaced...DONE
We've observed NVIV CEOs, guide the stock back to nears its 2010 IPO price $4.00/share twice since 2013…He Should Be DONE
We see Rich Roberts and Ken DiPietro still on the Board...value destroyers, whose own histories in our PXRB Board's opinion make them unfit for ANY public board so they must resign from the NVIV Board of Directors.
Will we see Dr. Rich Roberts and Ken DiPietro resign next? NVIV shareholders must be dreaming as they read this thinking, a fresh start without Roberts and DiPietro...GRAND SLAM. LOVE THE NEW TEAM.

"We all know that NVIV current CEO Mark Perin's took his company before NVIV as CEO into bankruptcy, and Perin has had 3 years (maybe two years too long) that's enough time to succeed with a Frank Reynolds' Neuroscaffold technology so it's time for change. The CEO of NVIV needs to be replaced to have a shot at commercializing NVIVs true value, the NeuroScaffold for treating acute spinal cord injury invented by Frank Reynolds.", said PixarBio CEO Frank Reynolds

**NVIV MAJOR ISSUES**

- Terrible Stock Performance, Terrible CEO, and Terrible Board of Directors 2013-2017
- Without conducting an exit interview of NVIV Founder, NVIV primary NeuroScaffold inventor and patent holder Frank Reynolds, NVIV shareholders have struggled to maintain the $520,000,000 in value created by Frank Reynolds, and today at $136mm they are dreadfully overvalued.

- It took years for NVIV to notify Frank Reynolds of their patent assignment issue, and Frank Reynolds will not provide FREE patents to NVIV. That request was ridiculous.
- There's never been a bridge for NVIV shareholders to own the commercial rights to the original Neuroscaffold and Frank Reynolds and PXRB can provide that to NVIV shareholders.
- Merging PXRB and NVIV is the only pathway for NVIV shareholders to have commercial rights to all of Frank Reynolds Neuroscaffold patents, Pain, Epilepsy, and Parkinson's know-how which is a HUGE win for NVIV shareholders
- By combining the PXRB and NVIV patent portfolios under one roof, the world of Neuroscience will be changed forever with a steady stream of R&D portfolio growth 2017-2039 to replace addictive opiates treating post-surgical pain, with a wide range of acute and chronic pain treatments, to develop acute and chronic spinal cord injury treatments, and to develop epilepsy and Parkinson's disease treatments.

**NVIV Under Frank Reynolds' Inventions and Leadership 2005 -2013**

- NVIV Market Cap went from $00.00 in November 2005, to $520,000,000 in July 2013
- NVIV shares hit a high of $24.80/share (split-adjusted)
- NVIV had years of cash and equivalents when Frank Reynolds resigned
- Frank Reynolds conceived and patented The Neuroscaffold with his personal checks, lawyers and contracts
- Frank Reynolds invented a Thick R&D portfolio with 7 Products in the pipeline 2005 – 2013.
- Today Non-opiate pain replacements are the hottest space in medicine but NVIV missed it.

**NVIV After Frank Reynolds August 2013-2017**

- Stock Plummeted within 60 days of Frank's resignation, by Sept-Oct 2013, the Board and management of NVIV had one product in-process at the FDA, and the stock plummeted to near $4.00/sh. (split-adjusted), which was Frank Reynolds' NVIV 2010 IPO share price
- In August 2013, Frank Reynolds had two of his inventions in-process for US FDA approval, but the NVIV Board of independent Board members didn't know the R&D pipeline and killed off a thick R&D portfolio including novel, non-opiate pain treatments invented by Frank Reynolds.
- NVIV Missed the Non-opiate pain market

- On Dec 31, 2016 at $4.20 NVIV is back to near its 2010 IPO price of about $4.00 (split-adjusted) for the second time since 2010 after hitting $4.00 in 2013.
- The 2013 NVIV Board of Directors is being replaced, but not fast enough

**Is NVIV really worth $136,000,000?**

The PixarBio offering price for NVIV is discounted to $77,000,000, or a take-under price because NVIV has failed to protect the Neuroscaffold's value, and in 2017, it is now back to near Frank Reynolds' 2010 IPO price per share of $4.00 (split-adjusted).

NVIV is near the 2010 $4.00 IPO share price, for the second time in 3.5 years since Frank Reynolds resigned.

"It's time for me to take back the technology and re-value what I invented, and bring my neurological patent portfolio to market after merging PXRB with NVIV", said PixarBio CEO, CFO, and Chief Science Officer Frank Reynolds. WE GOT THIS!!

**Major Benefits to NVIV Shareholders**

- NVIV shareholders get a great management team of R&D leaders from PXRB.
- A PXRB executive team with a history of growing shareholder value
- We believe the shareholder value will increase after NVIV is acquired for $77,000,000
- Increases probability of a Frank Reynolds Neuroscaffold patent deal to commercialize NVIV products creating the first possibility of a revenue stream for NVIV
- PXRB can solve NVIV's 2017 cleanroom constraints
- Frank Reynolds' original NVIV NeuroScaffold invention team currently works for PixarBio, so it simple plug and play on the SCI R&D treatments for chronic SCI patients. WE GOT THIS!!
- Brings true concept of invention back to NVIV shareholders and hope to chronic SCI patients
- What has NVIV invented since August 2013?
- PXRB's cGMP manufacturing facility coming on-line this summer 2017 to solve the NVIV crisis
- Under one roof the new company will be called Reynolds Therapeutics and NVIV shareholders can benefit from Frank Reynolds Key PXRB project, to regenerate human spinal cord for a chronic spinal cord injury patient

**A New Reynolds Therapeutics Will Deliver Financial Results for NVIV and PXRB Shareholders**

- Frank Reynolds was 2013 Boston Business Journal CFO of the year Finalist
- Combined companies have cash through 2018, with plenty of time to avoid another NVIV down-round.
- Only chance for NVIV shareholders to gain commercialization rights to a complete suite of NeuroScaffold patents combining PXRB and NVIV Neuroscaffold patents.
- PixarBio's Inventors of NeuroRelease a non-addictive, non-opiate morphine replacement has a thick R&D pipeline for the most desperate space in medicine, post-surgical pain, acute and chronic pain, that can remove addictive opiates from the hospital setting.
- PixarBio is the leader to replace opiates, and 92,000,000 surgeries per year in the USA we have the largest potential market in clinical medicine…acute and chronic pain
- PixarBio pipeline includes novel neuroscaffolds for acute and chronic spinal cord injury, drug delivery systems for epilepsy and Parkinson's.
- Expanded R&D portfolio Licensing Opportunities for all NVIV and PXRB Shareholders

The offer is contingent that none of the existing directors continuing to serve on the surviving entity.

**Justification for NVIV Take-under at $77,000,000**

- NVIV lacks Frank Reynolds Patent rights to commercialize the NeuroScaffold, the probability of a deal is zero under current Board of Directors and CEO
- Frank Reynolds has rejected NVIV request to assign rights to Neuroscaffold patent
- NVIV never compensated Frank Reynolds with shares for his inventions, and NVIV expects the use of the Neuroscaffold patents for free, but there will be a cost, and that cost must be factored into the current NVIV valuation, setting the new valuation around $77,000,000
- Since Reynolds resigned in 2013, NVIV CEOs twice have managed the stock down to Frank Reynolds' 2010 IPO price, CEO Mark Perrin has got to resign
- NVIV needs a CFO: Reynolds was finalist for CFO of the Year 2013. The temporary CFO brought in Q4 2016, has no EXPERIENCE as a public CFO, she is an internal hire with no leverage against the Board or leverage on Wall Street, so current NVIV valuation is way too high

- NVIV is back to its IPO again, A CFO MUST HAVE some Wall street exposure, this is NO TIME for training wheels
- PixarBio Founder Frank Reynolds not only won "2013 Boston Business Journal Finalist for CFO of the Year" but Frank Reynolds won the 2013 and 2016 Boston Business Journal Best Company to Work"
- During his career, Frank Reynolds is the ONLY CEO/CFO in Early Stage Pharma to have never done a down-round.
- Frank Reynolds education at Univ Penn: Wharton School, Harvard Business School, MIT-School, St Joe's Haub School of Business, Chestnut Hill College, and Temple Univ: Fox School of Business have provided him decades of more Wall Street experience than the Jan 2017 NVIV temporary CFO
- Frank Reynolds means a new life for NVIV shareholders

Today NVIV stock is back to its 2010 IPO Share price of about $4.00 (split-adjusted), for the second time since 2010, and both occurred after Reynolds left in 2013 and 2016.

"Our offering price of $77,000,000 is discounted, because NVIV has failed to develop my patents, science and know-how. NVIV appears to have lost the historically significant SCI primate research data, and they are now back to my 2010 IPO share price, for the second time in 3.5 years but its 2017. It is time I take back the technology I invented to bring my neurological R&D portfolio to market by acquiring NVIV and saving the NVIV shareholder from more years of down-rounds.", said PixarBio CEO Frank Reynolds

**Reynolds Therapeutics Value and Valuation: A typical yet classic acquisition**

**NVIV Needs New Management**

NVIV was founded by Frank Reynolds, and PixarBio was also Founded by Frank Reynolds so it's time to get back to basics, and make InVivo Therapeutics patent portfolio great again by selling to NVIV to PixarBio Corp and to create a new Reynolds Therapeutics.

The Reynolds Therapeutics valuation is based on real synergies. PixarBio market opportunity is HUGE with a market cap over $415,000,000. Tackling the morphine and opiate replacement market with non-opiate, and non-addictive new drugs to replace most opiates/opioids with expected US FDA approval in early 2019 is in the PixarBio wheelhouse for success. PXRB non-opiate platform provides a huge present and future valuation. PXRB is currently undervalued.

A purchase price of $77,000,000 for NVIV brings great value to PXRB

shareholders. We can see a patent deal with Reynolds putting value back into the NVIV business unit, then complementing the PXRB Neuroscaffold platform.

**Return on Investment for NVIV Shareholders…The Decision is A NO-BRAINER**

Reynolds Therapeutics is a story based on a classic case of a GREAT PixarBio mgmt. team buying NVIVs bad mgmt. team and Reynolds Therapeutics applying Great R&D mgmt. principles to regain the Neuroscaffold shareholder value. We will turn the NVIV SCI innovation engine BACK-ON to complement PixarBio's SCI Neuro-trauma Innovative R&D Portfolio, and PixarBio Mgmt. will monetize the NVIV value.

- PixarBio's Post-surgical pain treatment market is HUGE at 92,000,000 yearly surgeries in USA, representing revenue opportunity that exceeds $30B per year
- In addition to the surgical market, PixarBio acute/chronic pain treatment such as cancer, sports injuries, trauma, degenerative disease, diabetic neuropathy and many others and those acute/chronic pain markets exceed $40B per year
- NVIV has a potential market of about 12,000 people paralyzed per year in the USA, but has targeted through FDA application just a tiny subset of the 12,000 injuries, possibly as low as 50 SCI injuries per year, and PXRB can solve that problem expanding the SCI market opportunity near 4,000 treatments per year
- Reynolds Therapeutics will help balance the risk for NVIV shareholders for the small market risk of acute spinal cord injury with PXRB's Huge Post-surgical pain mkt. potential
- PixarBio's Neuro-trauma R&D portfolio helps mitigate NVIV investor risks
- In Q4 2016, Frank Reynolds took PXRB Public at $2.00 per share closing 12/31/2016 at $4.59 per share for a 129% ROI in 2016. NVIV was down ~46%
- PixarBio, The inventor of NeuroRelease, a potential morphine replacement that's non-addictive and non-opiate is undervalued since October 31, 2016, when it became publicly traded.
- Combining PXRB with NVIV assets brings Frank Reynolds patents together, and the synergies will be great for patients and investors.
- Obtaining a Neuroscaffold patent agreement with Reynolds, provides NVIV assets a much higher valuation than the $77,000,000 we see as the NVIV value today.

"Most importantly, the neurological R&D space desperately needs a new

generation of leaders to create, capture and monetize inventions in pharma. If you look at recent CEO moves like Biogen's and others CEO's in neuroscience are failing. Neuroscience Pharma needs new industry leadership and PixarBio is perfectly prepared to lead, as investors and patients become more desperate for returns from investments. PixarBio's 2017 Deal making is NOT done. The industry needs consolidation, so let's get busy and make US Pharma great again", said Frank Reynolds PixarBio CEO and Founder

**NVIV Background**

Founded by Frank Reynolds on November 28, 2005 and added MIT's Robert S Langer as Advisor to CEO and Co-Founder in Q4 2006.

**PXRB Background**

Co-Founded by Frank Reynolds, Katrin Holzhaus and MIT's Robert S. Langer on August 29, 2013

(Emphasis in original.)

98.     In response to InVivo's assertion that Defendant Reynolds has no intellectual property claims on the neuro-spinal scaffold technology, Defendant Reynolds caused the Company to issue a press release on January 4, 2017 titled "PixarBio Corporation Responds to InVivo Therapeutics False Patent and Intellectual Property Claims" (the "1/4/17 Press Release"). In the 1/4/17 Press Release, the Company increased its offer for InVivo to $100 million and made the following allegations:

PixarBio Corporation, (OTCQX:PXRB) developers of NeuroReleaseTM, a morphine replacement, non-opiate/opioid, non-addictive pain treatment with FDA approval expected in early 2019, announced a response to InVivo Therapeutics press release dated January 3, 2017. The press release claims that, "InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested."

**The InVivo response is a Legal Play on Trademarks; Real Life Has Witnesses**

**Did InVivo Lose Records?**

- 43 -

Frank Reynolds filed over 40 patents applications at InVivo Therapeutics, capturing the Neuroscaffold in legal documents.

As the Founder of InVivo Therapeutics and the only employee of InVivo Therapeutics 2005-2008 he personally selected, hired, contracted, and paid with his own personal check to a few different patent law firms that filed his Neuroscaffold patents 2005-2008; and from Nov 2005 - August 2013 he was the ONLY scientist to attend every patent lawyer meeting for the InVivo NeuroScaffold. He was the only scientist in more than 80% of NeuroScaffold patents meetings from 2005-2013 totaling more than 200 NeuroScaffold patent meetings.

Frank Reynolds stated, "Today I had over 20 former staff jump to my defense and I know I can find 100+ lawyers, employees, consultants, advisors, that all lived through my Neuroscaffold invention with me, as I hired them all along the way. InVivo must have lost years of records."

**"Legal Play on words" or "Play on Trademarks" in the InVivo response**

Reynolds stated. "I own the trademark for Neuroscaffold, and when NVIV learned of the USPTO ruling, they realized I would not sign over the trademarks so InVivo created a new trademark "Neuro-Spinal Scaffold" and that trademark was indeed created after I left InVivo so I didn't invent anything under that moniker or the trademark "Neuro-Spinal Scaffold" but I certainly invented the NeuroScaffold for spinal cord injury at InVivo Therapeutics 2005-20013 about a decade before InVivo even thought up the moniker or trademark "Neuro-Spinal Scaffold". The new mgmt. team should have conducted an exit interview with me in 2013".

If InVivo doesn't have any record of my inventorship 2005-2013, they are worse off than anyone can imagine, because we had less than 8 employees until 2010 so who can they claim invented it? I spent 110 hours per week from 2005-2013 inventing the NeuroScaffold.

What else did InVivo Management lose? Data from my historically significant primate studies for spinal cord injury? In 2017, InVivo still cannot locate the original primate study data processed 2008-2012.

**NVIV should not mislead investors based on mincing trademarked words.**

There are over 100 real people that know Frank Reynolds led the invention of the NeuroScaffold for Spinal cord injury so stop misleading with investors.

**We will increase our offer for InVivo Therapeutics to $100,000,000, but Richard Roberts and Ken DiPietro must resign from the Board of Directors**

- 44 -

**and Mark Perin of course must resign.**

The real question is if they claim I'm not on patents: Are they so bad they couldn't lock up their founder and inventor, they should be replaced just for letting NVIV get this bad. Why didn't they get the founder on the invention documents? Why put out a statement that says the founder's not on patents, he's not signed over anything??…NOT BRIGHT, we all know to sign and lock up our stars.

The failure to conduct an exit interview resulted in lost IP to InVivo Therapeutics but that doesn't change the facts of reality that's recorded in 8 years of calendars, meetings minutes, and even an iPaq.

WE ALL KNOW, and Frank Reynolds knows who was the inventor on every NeuroScaffold patent call, and it was Frank Reynolds

**We look forward to the Board of InVivo Therapeutics taking a look around at this week's emergency meetings and asking who and what are they fighting for, is it really for shareholders?**

**We do not expect any major personnel changes after the acquisition except at the CEO and Board level.**

**We encourage the Board of Directors of InVivo Therapeutics to vote to be acquired by PixarBio, and they should do it as soon as possible**

(Emphasis in original.)

99.     On January 23, 2017, PixarBio issued a press release (the "1/23/17 Press Release") announcing that it withdrew its offer for InVivo "for reasons related to management credibility and competence, corporate governance and IP control." The Company stated that it would "stay focused on [its] NeuroRelease Pain platform and continue to drive [its] non-opiate non addictive morphine replacement to market with FDA approval expected between the end of 2018 and early 2019."

<u>**The SEC Release and Suspension Order**</u>

100.    Following the announcement of the withdrawal, the SEC issued a release (the "SEC

Release") the same day announcing the temporarily suspension of trading in the securities of

PixarBio. The SEC Release provided, in pertinent part:

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

SECURITIES EXCHANGE ACT OF 1934
Release No. 79852 / January 23, 2017

**The Securities and Exchange Commission ("Commission") announced the
temporary suspension, pursuant to Section 12(k) of the Securities Exchange
Act of 1934 (the "Exchange Act"), of trading in the securities of PixarBio
Corporation (OTCQB:PXRB), of Medford, Massachusetts at 9:30 a.m. on
January 23, 2017, and terminating at 11:59 p.m. on February 3, 2017.**

**The Commission temporarily suspended trading in the securities of PixarBio
because the market for the security appears to reflect manipulative or
deceptive activities and because of questions regarding the accuracy of
assertions by PixarBio in press releases and its Form S-1 concerning, among
other things: (1) the company's business combinations and current
shareholders; (2) the identity and qualifications of key shareholders and
employees; and (3) the company's current and prospective development
efforts. This order was entered pursuant to Section 12(k) of the Exchange Act.**

The Commission cautions broker-dealers, shareholders, and prospective purchasers
that they should carefully consider the foregoing information along with all other
currently available information and any information subsequently issued by the
company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-
11 under the Exchange Act, at the termination of the trading suspension, no
quotation may be entered unless and until they have strictly complied with all of
the provisions of the rule. If any broker or dealer has any questions as to whether
or not he has complied with the rule, he should not enter any quotation but
immediately contact the staff in the Division of Trading and Markets, Office of
Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain
as to what is required by Rule 15c2-11, he should refrain from entering quotations
relating to PixarBio's securities until such time as he has familiarized himself with
the rule and is certain that all of its provisions have been met. If any broker or dealer
enters any quotation which is in violation of the rule, the Commission will consider

the need for prompt enforcement action.

(Emphasis added.)

101.    On March 21, 2017, the Company disclosed -- in a letter to shareholders providing

an update about the SEC investigation that was filed as an exhibit to a Form 8-K filed with the

SEC -- that the Company and Defendant Reynolds received subpoenas from the SEC on January

23, 2017, and that other individuals also received subpoenas.  The Company's update stated in

pertinent part:

> the Securities and Exchange Commission ("SEC") announced on January 23, 2017
> the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act
> of 1934, of trading of PixarBio's securities from January 23, 2017 to February 3,
> 2017 at 11:59 PM (the "Suspension Period"). The Suspension Period has expired
> and no further suspensions or extension of such suspension has been issued.
> PixarBio is optimistic - - but cannot predict - - that the temporary suspension will
> not be reinstated.
>
> On January 23, 2017, PixarBio and Frank Reynolds each received a subpoena from
> the Division of Enforcement at the SEC. Additional subpoenas have been received
> by other individuals. The SEC indicated it was conducting an investigation
> requiring the production of documents and information. PixarBio will continue to
> produce and supply documents and cooperate fully with the SEC regarding the
> subpoena and any potential future inquiries and is committed to resolving all issues
> in connection with the investigation. PixarBio is optimistic that the investigation
> will be resolved successfully but cannot predict the outcome of the investigation.
> We note that it is possible that an unfavorable outcome could have a material
> adverse effect on our financial position, liquidity and results of operations. We will
> keep you apprised of any further developments.

102.    On April 3, 3017, the Company filed on a Form 12b-25 with the SEC a notification

of late filing of its annual report for the fiscal year ended December 31, 2016 on Form 10-K.  The

Company's purported reason for not filing the Form 10-K on time is that the "Registrant could not

complete the required financial statements within the prescribed filing date without unreasonable

effort and expense."

**Summary of Individual Defendants Wrongful Conduct**

103.     In breach of their fiduciary duties owed to PixarBio, Individual Defendants caused the Company to engage in manipulative and deceptive activities with the intent to inflate the Company's stock price.  The Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact concerning: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.  One of the Director Defendants sold over 64,500 shares of Company stock on material non-public information at artificially inflated prices, and he and two of the other Individual Defendants were set to offer stock for sale while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact.

104.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

**DAMAGES TO PIXARBIO**

105.     As a direct and proximate result of the Individual Defendants' conduct, PixarBio will lose and expend many millions of dollars.

106.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and the CEO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

107.    Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

108.    Such losses include those caused by the trading suspension.

109.    As a direct and proximate result of the Individual Defendants' conduct, PixarBio has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

110.    Plaintiff brings this action derivatively and for the benefit of PixarBio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PixarBio and unjust enrichment, as well as the aiding and abetting thereof.

111.    PixarBio is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.    Plaintiff is, and at all relevant times has been, a PixarBio shareholder.  Plaintiff will adequately and fairly represent the interests of PixarBio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

113.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

114.    A pre-suit demand on the Board of PixarBio is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Bridges and Defendants Reynolds, Holzhaus, Cass, and Morse (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to three of the five Directors that are on the Board at the time this action is commenced.

115.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in manipulative and deceptive activities, and to make false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

116.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

117.    Additional reasons that demand on Defendant Reynolds is futile follow.  Defendant Reynolds is the Company's CEO, CFO, CSO and Chairman of the Board, and is thus, a non-independent director. Indeed, according to the Registration Statement, Defendant Reynolds's

employment agreement enabled him to receive millions of dollars in compensation from the Company. Defendant Reynolds was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, almost all of which he signed, and those contained in the press releases, and including many of which he personally made. Defendant Reynolds's large Company stock holding, worth about $480 million, reveals his interest in keeping the Company's stock price as high as possible. In fact, Defendant Reynolds was set to receive enormous benefits by offering 48,155,567 shares for sale as part of the Company's offering at an inflated price. Moreover, Defendant Reynolds conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and to manipulate the market, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Reynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Holzhaus is futile follow.  As the Chief Administrative Officer, a director and a member of the Audit Committee of the Company, Defendant Holzhaus is especially culpable for the misconduct alleged herein. She conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and to manipulate the market, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.

According to the Registration Statement, Defendant Holzhaus's employment agreement enabled her to receive generous compensation from the Company. Defendant Holzhaus's large Company stock holding, worth about $25 million, reveals her interest in keeping the Company's stock price as high as possible. In fact, Defendant Holzhaus was set to receive enormous benefits by offering 2,497,794 shares for sale as part of the Company's public offering at an inflated price. Moreover, Defendant Holzhaus had worked in the executive suite with Defendant Reynolds for over 15 years, rendering her incapable of considering the demand properly and impartially. As an officer of the Company, she depended on Defendant Reynolds, owner of more than half of the Company's stock, for her livelihood, and thus would not consider a demand to make claims against Defendant Reynolds.  Thus, for these reasons, too, Defendant Holzhaus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Cass is futile follow.  As a director and a member of both the Audit Committee and the General Nominating Committee of the Company, Defendant Cass is especially culpable for the misconduct alleged herein. He conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and to manipulate the market, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Cass's large Company stock holding, worth about $1.2 million, reveals his interest in keeping the Company's stock price as high as possible. In fact, Defendant Cass sold over 64,500 shares of Company stock on material non-public information at artificially

inflated prices and was set to receive additional enormous benefits by offering 120,459 shares for sale as part of the Company's public offering at an inflated price. Thus, for these reasons, too, Defendant Cass breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.     Additional reasons that demand on Defendant Morse is futile follow.  As a director and a member of both the Audit Committee and the General Nominating Committee of the Company, Defendant Morse is especially culpable for the misconduct alleged herein. She conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and to manipulate the market, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Defendant Morse's Company stock holding, worth at least $697,102, reveals her interest in keeping the Company's stock price as high as possible. Thus, for these reasons, too, Defendant Morse breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

121.     Additional reasons that demand on Bridges is futile follow.  As a director and a member of both the Audit Committee and the General Nominating Committee of the Company, Bridges is especially culpable for the misconduct alleged herein. He conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements and to manipulate the market, consciously disregarded his duties to monitor such controls over reporting

and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Bridges' Company stock holding, worth at least $236,105, reveals his interest in keeping the Company's stock price as high as possible. Thus, for these reasons, too, Bridges breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on the Board is futile follow.

123.    Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

124.    PixarBio has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for PixarBio any part of the damages PixarBio suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors would be futile.

125.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

126.     The acts complained of herein constitute violations of fiduciary duties owed by PixarBio's officers and directors, and these acts are incapable of ratification.

127.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of PixarBio.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of PixarBio, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

128.     If there is no directors' and officers' liability insurance, then the Directors will not cause PixarBio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

129.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PixarBio's business and affairs.

132.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or with gross negligence breached or disregarded their fiduciary duties to protect the rights and interests of PixarBio.

134.    In breach of their fiduciary duties owed to PixarBio, Individual Defendants caused the Company to engage in manipulative and deceptive activities with the intent to inflate the Company's stock price.

135.    In breach of their fiduciary duties owed to PixarBio, Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact concerning: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees;

and (3) the company's current and prospective development efforts.  The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.  One Director Defendant sold over 64,500 shares of Company stock on material non-public information at artificially inflated prices, and he and two of the other Individual Defendants were set to offer stock for sale while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact.

136.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

137.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PixarBio's securities and selling stock at inflated prices.

138.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

139.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PixarBio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff on behalf of PixarBio has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PixarBio.

144.    The Individual Defendants either benefitted financially from the improper conduct and false and misleading statements and their selling stock at an inflated price, or received bonuses, stock options, or similar compensation from PixarBio that was tied to the performance or artificially inflated valuation of PixarBio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.     Plaintiff, as a shareholder and a representative of PixarBio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

146.     Plaintiff on behalf of PixarBio has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

147.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PixarBio, for which they are legally responsible.

149.     As a direct and proximate result of the Individual Defendants' abuse of control, PixarBio has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, PixarBio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.     Plaintiff on behalf of PixarBio has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

151.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PixarBio in a manner consistent with the operations of a publicly-held corporation.

153.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, PixarBio has sustained and will continue to sustain significant damages.

154.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of PixarBio, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused PixarBio to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

158.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

159.    Plaintiff on behalf of PixarBio has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of PixarBio, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PixarBio;

(c)     Determining and awarding to PixarBio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing PixarBio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PixarBio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of PixarBio to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

(e)     Awarding PixarBio restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: May 2, 2017                                  Respectfully submitted,

**PAWAR LAW GROUP P.C.**


/s_____
Vik Pawar, Esq.
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*